UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          v.                        )        Criminal No. 96-0452 (PLF)
                                    )
ANTOYNE P. WHITE,                   )
                                    )
          Defendant.                )
_____)

OPINION

Before the Court is Antoyne P. White's Motion for Reduction of Sentence Under

the Incarceration Reduction Amendment Act of 2016 [Dkt. No. 96].  Mr. White has been

incarcerated for more than twenty-five years following his plea of guilty to charges of second-

degree murder while armed, attempted armed robbery, conspiracy to commit robbery, and

unauthorized use of a motor vehicle.  See Judgment [Dkt. No. 41] at 1.  The Incarceration

Reduction Amendment Act ("IRAA") requires that the Court reduce Mr. White's sentence if

(1) Mr. White satisfies the statute's threshold eligibility requirements, and (2) the Court's

consideration of eleven statutory factors demonstrates to the Court's satisfaction that Mr. White

is not now a danger to the community and that the interests of justice warrant a sentence

reduction.  See D.C. Code § 24-403.03(a).  Mr. White requests a reduction of his sentence to

time served and between one and three years of probation.  Mot. at 67.  Upon careful

consideration of the parties' filings, the relevant legal authorities, the arguments presented by

counsel at the April 7, 2021 evidentiary hearing, the representations made at the August 3, 2023

resentencing hearing, and the entire record in this case, the Court will grant Mr. White's motion

for a reduction of sentence.[1]

_____

[1]        The documents reviewed in connection with Mr. White's motion include: Indictment [Dkt. No. 29]; Superseding Information [Dkt. No. 32]; Plea Agreement [Dkt. No. 33]; Presentence Investigation Report ("PSR"); Judgment [Dkt. No. 41]; Motion for Reduction of Sentence Under The Incarceration Reduction Amendment Act of 2016 (D.C. Code § 24-403.03) ("Mot.") [Dkt. No. 96]; United States' Opposition to Defendant's Motion for Reduction of Sentence Under The Incarceration Reduction Amendment Act of 2016 ("Gov't Opp.") [Dkt. No. 102]; Reply in Support of Motion for Reduction of Sentence Under The Incarceration Reduction Amendment Act ("Reply") [Dkt. No. 103-1]; United States Exhibit #1, Victim Impact Letter ("Gov't Ex. 1") [Dkt. No. 107-1]; Psychological Evaluation Report of Dr. John M. Shields, Ph.D., ABPP ("Shields Rep.") (Exhibit 52) [Dkt. No. 116]; Transcript of Evidentiary Hearing, United States v. White, Crim. No. 96-0452 (Apr. 7, 2021) ("Hearing Tr."); May 4, 2021 U.S. Probation Office Memorandum ("Kevin White Probation Mem.") [Dkt. No. 109]; June 14, 2021 U.S. Probation Office Memorandum ("Alfreda Nelson Probation Mem.") [Dkt. No. 112]; United States' Response to Court's June 8, 2023 Order [Dkt. No. 142]; July 25, 2023 U.S. Probation Office Memorandum ("Residence Probation Mem.") [Dkt. No. 145]; United States' Response to Probation Memoranda and Court Order [Dkt. No. 150-1]; D.C. Council Comm. on the Judiciary, Rep. on B. 21-0683, The "Comprehensive Youth Justice Amendment Act of 2016" (Oct. 5, 2016), https://lims.dccouncil.gov/downloads/LIMS/35539/Committee_Report/B21-0683-CommitteeReport1.pdf <https://perma.cc/HV8N-LMYW> ("2016 Comm. Rep."); and D.C. Council Comm. on the Judiciary, Rep. on B. 22-0255, the "Omnibus Public Safety and Justice Amendment Act of 2018" (Nov. 28, 2018), https://lims.dccouncil.gov/downloads/LIMS/37976/Committee_Report/B22-0255-CommitteeReport1.pdf <https://perma.cc/SDQ6-P9CX> ("2018 Comm. Rep.").

        The Court also reviewed the following exhibits and supplemental briefs provided by counsel for Mr. White: Exhibit List [Dkt. No. 136]; White Motion Exhibits (Exhibits 1-36) [Dkt. No. 96]; White Reply Exhibits (Exhibits 37-43) [Dkt. No. 103]; Notice of Corrected PATTERN Score (Exhibit 44) [Dkt. No. 106]; Joint Response to Court's Hearing Request (Exhibit 45) [Dkt. No. 108]; Supplement Regarding Proposed Release Address (Exhibits 46-47) [Dkt. No. 110]; Supplement Regarding Letter in Support, LEAD Up!, Expert, and Proposed Release Address (Exhibits 48-49) [Dkt. No. 113]; Supplement Regarding Continuing Educational Endeavors (Exhibits 50-51) [Dkt. No. 115]; Supplement Juris Libertas Letter of Recommendation (Exhibit 53) [Dkt. No. 117]; Supplement (Exhibits 54-65) [Dkt. No. 121]; Motion For Leave To File Exhibits Under Seal (Exhibit 66) [Dkt. No. 134]; Supplement (Exhibits 67-69) [Dkt. No. 133]; Supplement (Exhibit 70) [Dkt. No. 139]; Supplement in Response to Court Order (Exhibit 71) ("June 2023 Supp.") [Dkt. No. 141]; Response to Probation Memoranda and Court Order [Dkt. No. 147-1] (collectively, "White Ex." and the corresponding exhibit number and document title).

        Among the exhibits submitted by counsel for Mr. White are several decisions of the Superior Court of the District of Columbia, which will hereinafter be cited with the exhibit

## I.  FACTUAL AND PROCEDURAL HISTORY

Antoyne White was seventeen years old when he planned and participated in the botched robbery that led to the tragic death of Mun Hon Kim and Mr. White's sentence of forty years to life in prison.  Born in 1978, Mr. White grew up in Southeast Washington, D.C., in a home where he was exposed to substance abuse and violence at a young age.  Mot. at 10-12; White Ex. 28 (Alfreda Nelson Letter); White Ex. 30 (2019 Personal Statement).  His first interaction with the justice system occurred when he was fourteen years old.  PSR ¶ 17.  By then, he had already witnessed the shootings of four neighbors, two of whom died.  Mot. at 17, 26. Mr. White has been incarcerated since November 26, 1996.  See PSR at 2.  He is now forty-four years old, having spent the last twenty-seven years of his life in jail and prison.  See id. ¶ 30; White Ex. 4 (Plea Hearing Tr.) at 15-16 (Mr. White was arrested on June 16, 1996 and was incarcerated in Maryland before his federal sentence was imposed).

---

number and case name: White Ex. 38, United States v. Ackwith, 1993 FEL 004546 (D.C. Super. Ct. Sept. 9, 2020) [Dkt. No. 103-2]; White Ex. 39, United States v. Stewart, 1997 FEL 008176 (D.C. Super. Ct. Sept. 4, 2019) [Dkt. No. 103-2]; White Ex. 40, United States v. Carpenter, 1996 FEL 003695 (D.C. Super. Ct. May 4, 2020) [Dkt. No. 103-2]; White Ex. 41, United States v. McDowell, 1996 FEL 010560 (D.C. Super. Ct. Feb. 5, 2020) [Dkt. No. 103-2]; White Ex. 42, United States v. Plummer, 1997 FEL 000748 (D.C. Super. Ct. Feb. 5, 2020) [Dkt. No. 103-2]; White Ex. 43, United States v. Padgett, 1996 FEL 009305 (D.C. Super. Ct. July 13, 2020) [Dkt. No. 103-2]; White Ex. 55, United States v. Winstead, 1997 FEL 004943 (D.C. Super. Ct. Apr. 12, 2021) [Dkt. No. 121-3]; White Ex. 56, United States v. Gibson, 1997 FEL 003754 (D.C. Super. Ct. Apr. 14, 2021) [Dkt. No. 121-3]; White Ex. 57, United States v. Leaks, 2000 FEL 006595 (D.C. Super. Ct. Jan. 25, 2021) [Dkt. No. 121-3]; White Ex. 58, United States v. Adams, 1996 FEL 009301 (D.C. Super. Ct. Apr. 11, 2019) [Dkt. No. 121-3]; White Ex. 59, United States v. Johnson, 1998 FEL 004239 (D.C. Super. Ct. June 16, 2021) [Dkt. No. 121-3]; White Ex. 60, United States v. Downing, 2000 FEL 007104 (D.C. Super. Ct. Nov. 9, 2021) [Dkt. No. 121-3]; White Ex. 61, United States v. Auguste, 1994 FEL 007910 (D.C. Super. Ct. Dec. 14, 2018) [Dkt. No. 121-3]; White Ex. 62, United States v. Parker, 1993 FEL 006266 (D.C. Super. Ct. Apr. 18, 2022) [Dkt. No. 121-3]; White Ex. 63, United States v. Houston, 1993 FEL 003638 (D.C. Super. Ct. July 9, 2021) [Dkt. No. 121-3]; and White Ex. 64, United States v. Alston, No. 19-co-1118 (D.C. Feb. 8, 2022).

The offenses for which Mr. White seeks a sentence reduction occurred on June 11, 1996. See Indictment at 1. On that day, Mr. White and two other teenagers armed themselves with a Smith & Wesson .38 caliber revolver and a Taurus .9mm semi-automatic pistol and drove through Northeast D.C. with the intent to commit a robbery. Id. ¶¶ 1-5. The three adolescents parked the car and identified a pedestrian, Gregory Paul, near the intersection at 46th and Jay Streets, Northeast. See id. ¶¶ 5, 7; Gov't Opp. at 2. A U.S. Postal Service mail truck operated by Mun Hon Kim, a mail carrier, was parked near the intersection. Indictment ¶¶ 7-8. Mr. Paul and Mr. Kim were talking when Mr. White and one of the other boys approached the mail truck. Id. Mr. White pointed a revolver in their direction and instructed Mr. Paul and Mr. Kim to get on the ground. Id. A nearby citizen yelled out a warning, and Mr. White pulled the trigger. Id. ¶ 9; see Mot. at 33. The shot Mr. White fired struck Mr. Kim in the head, and Mr. Kim died six days later. Indictment ¶ 9.

Proceedings began in this Court in 1996, when the government brought charges against Mr. White pursuant to 18 U.S.C § 5032, which provides procedures for charging juveniles with offenses in federal court. See United States v. A.W., Crim. No. 96-0452, 1997 WL 118408, at *1 (D.D.C. Feb. 20, 1997). Mr. White's counsel filed a motion to dismiss for lack of jurisdiction in this Court. Id. After a hearing on the motion and a juvenile transfer hearing under 18 U.S.C. § 5032, Judge Harold H. Greene of this Court ordered that Mr. White be prosecuted as an adult in federal court. See id. at *3. A grand jury subsequently indicted Mr. White on March 18, 1998, charging him with both federal and D.C. Code offenses, including First Degree Murder of a United States Employee in violation of 18 U.S.C. §§ 1111, 1114, and Possession of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c). See

Indictment.[2]  After plea negotiations, the government filed an information charging Mr. White with Carrying a Pistol Without a License, in violation of D.C. Code § 22-3204(a)(1).  See Superseding Information.

On June 30, 1998, Mr. White entered a plea of guilty to the one-count Superseding Information, charging Carrying a Pistol Without a License, D.C. Code § 22-3204(a)(1); Count Three of the Indictment, Conspiracy to Commit Robbery, D.C. Code § 22-105a; Count Four of the Indictment, Attempted Robbery While Armed, D.C. Code §§ 22-2092, 22-3202; Count Seven of the Indictment, Second Degree Murder While Armed, D.C. Code §§ 22-2403, 22-3202; and Count Ten of the Indictment, Unauthorized Use of a Motor Vehicle, D.C. Code § 22-3815.  See Indictment; Superseding Information; Plea Agreement at 1-2.  Pursuant to the plea agreement, the government moved to dismiss all remaining counts. See Judgment at 1.

On November 3, 1998, Judge Greene sentenced Mr. White to the "maximum penalty allowed" for each count: twenty months to five years on the firearm offense; twenty months to five years on Count Three, conspiracy; fifteen years to life on Count Four, attempted armed robbery; twenty years to life on Count Seven, second-degree murder; and twenty months to five years on Count Ten, the unauthorized use of a motor vehicle offense.  See White Ex. 5 (Sentencing Hearing Tr.) at 28:12-29:5; Judgment at 2.  Mr. White's sentences on all counts were to run consecutively.  Judgment at 2.  In total, Mr. White received an indeterminate

---

[2]      Mr. White was indicted on the following charges:  First Degree Murder of a United States Employee, 18 U.S.C. §§ 1111, 1114; Possession of a Firearm During a Crime of Violence, 18 U.S.C. § 924(c)(1); Conspiracy, D.C. Code § 22-105a; Attempted Robbery While Armed, D.C. Code §§ 22-2902, 22-3202; Possession of a Firearm During a Crime of Violence, D.C. Code § 22-3204(b); First Degree Murder While Armed – Felony Murder, D.C. Code §§ 22-2401, 22-3202; and Unauthorized Use of a Motor Vehicle, D.C. Code § 22-3815.  See Indictment.

sentence of forty years to life in prison.  Id.  Mr. White appealed.  See United States v. White, No. 98-3139, 203 F.3d 54 (Table), at *1 (D.C. Cir. 1999).  The D.C. Circuit vacated the sentence imposed on the charge of Carrying a Pistol Without a License, finding a lack of federal jurisdiction, but it affirmed the convictions and sentences on all remaining counts.  Id.  As a result, Mr. White's sentence was reduced to a total of thirty-eight-and-one-third years to life in prison.  See Memorandum Opinion and Order [Dkt. No. 78] at 5.

On September 22, 2020, Mr. White filed this Motion for Reduction of Sentence. The United States filed its opposition on November 24, 2020, and Mr. White filed a reply on December 8, 2020.  The Court held a hearing on April 7, 2021, at which time both sides presented arguments and had the opportunity to present testimony and other evidence.  See D.C. Code § 24-403.03(b)(2) ("The court shall hold a hearing on the motion.").  Subsequently, on behalf of Mr. White, Dr. John M. Shields, Ph.D., ABPP, submitted a detailed mental health report, following a review of Mr. White's medical records, juvenile records, and an extensive interview with Mr. White.  See Shields Rep. at 3.  The government sought to introduce its own expert report, but the Court struck the report from the record ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. See Order [Dkt. No. 138].

On June 8, 2023, the Court directed the parties and the United States Probation Office to provide the Court with supplemental information related to Mr. White's reentry plan and potential conditions of probation.  See Order [Dkt. No. 140].  Counsel for Mr. White submitted a supplement addressing Mr. White's reentry plans on June 22, 2023.  See June 2023 Supp.  The government submitted a supplement addressing Mr. White's post-release supervision

on July 7, 2023.  <u>See</u> United States' Response to Court's June 8, 2023 Order [Dkt. No. 142].

The Probation Office provided the Court with a written memorandum regarding Mr. White's

supervision on July 13, 2023, <u>see</u> July 13, 2023 U.S. Probation Office Mem. [Dkt. No. 144], and

a supplemental memorandum about Mr. White's housing and supervision conditions on July 25,

2023.  <u>See</u> Residence Probation Mem.  The parties submitted responses to the U.S. Probation

Office's recommendations on July 28, 2023.  <u>See</u> Response to Probation Memoranda and Court

Order [Dkt. No. 147-1]; United States' Response to Probation Memoranda and Court Order [Dkt.

No. 150-1].  The parties appeared for a sentencing hearing on August 3, 2023.  <u>See</u> Order [Dkt.

No. 143].

## II.  INCARCERATION REDUCTION AMENDMENT ACT

In 2016, the D.C. Council sought to overhaul the juvenile justice system in the

District of Columbia.  Recognizing the "growing evidence related to the pace of brain

development in adolescents and how the developing brain impacts decision-making and

culpability," 2016 Comm. Rep. at 2, the Council enacted broad reforms to the juvenile justice

system in the Comprehensive Youth Justice Amendment Act of 2016 ("CYJAA").  <u>See</u> D.C.

Law 21-238, Comprehensive Youth Justice Amendment Act of 2016, 63 D.C. Reg. 15312

(Dec. 7, 2016) (effective Apr. 4, 2017).  Title III of the CYJAA is the Incarceration Reduction

Amendment Act ("IRAA"), which contains the sentencing modification provisions that authorize

Mr. White's sentence reduction request.  <u>See</u> <u>id</u>. at §§ 301, 306 (codified as amended at D.C.

Code § 24-403.03).  The IRAA provides a mechanism under which a person's sentence can be

reduced if a court, after considering the enumerated statutory factors, determines that the person

is not a danger to the community and that the interests of justice warrant a sentence modification.

<u>See</u> D.C. Code § 24-403.03(a).

Before enacting the IRAA, the D.C. Council reviewed contemporary research on child development science, which overwhelmingly indicates that children and adolescents have a harder time using good judgment and understanding the long-term consequences of their actions. See 2016 Comm. Rep. at 3.  The parts of the brain responsible for planning and impulse control "may not be fully developed until the mid-twenties."  Id.  The developmental differences between adults and young adults compel a different penological response by the criminal legal system, one that recognizes young adults' "reduced culpability and their capacity for rehabilitation and growth."  Id. at 4.

In addition to examining recent child development research, the D.C. Council acknowledged the external factors that contribute to juvenile offending, concluding that juvenile offending is strongly associated with racial and economic inequality.  See 2016 Comm. Rep. at 5.  In 2016, ninety percent of the children and young adults incarcerated in the District of Columbia had a mental health diagnosis, and one hundred percent of the committed youth population was Black.  Id.  The D.C. Council also heard testimony from members of the community highlighting the relationship between poverty and one's involvement in the criminal and juvenile justice systems.  Id. at 81, 262-69, 357.  The D.C. Council recognized how adverse childhood experiences, such as exposure to violence at a young age, can negatively affect children's health outcomes and behavior.  Id. at 5.  Along with providing a sentencing review mechanism for juveniles prosecuted as adults, the CYJAA also sought to limit the potential for children to experience violence through the criminal legal system by reducing juvenile arrests and detention.  Id. at 6-9.  And, by allocating more resources to juvenile diversion and rehabilitation services, the D.C. Council took steps to ameliorate the inequalities associated with higher rates of juvenile offending.  Id. at 22-24.

In 2019, the D.C. Council amended and expanded the IRAA, and it is under this version of the statute that Mr. White seeks a sentence reduction.  See D.C. Code § 24-403.03(f); 2018 Comm. Rep. at 8.  These amendments included several noteworthy changes.  First, the Council removed certain permissive language from the statute.  In its original form, the IRAA stated that a court "may" reduce a person's sentence after determining that the person does not present a danger to the community and that the interests of justice warrant a sentence modification.  D.C. Code § 24-403.03(a) (2017).  As amended, the statute provides that a court "shall" reduce a person's sentence if it makes the same findings.  Id. (2019).  Second, the IRAA originally required that a person serve at least twenty years before applying for a sentence reduction, but the 2019 amendments lowered this requirement to fifteen years.  Compare id. (2017) and id. (2019).  Third, the D.C. Council struck "the nature of the offense" for which a person was sentenced from the list of factors to be considered.  Compare D.C. Code § 24-403.03(c)(2) (2017) and id. (2019).  Fourth, the Council substantially amended the language of the tenth factor, emphasizing the "diminished culpability of juveniles."  See D.C. Code § 24-403.03(c)(10).  As originally enacted, this subsection instructed courts to consider juvenile characteristics that "counsel against sentencing them to a lifetime in prison."  Id. (2017).  The amended statute expands the population eligible for relief under the IRAA to those sentenced "to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime."  Id. (2019).  This change made clear that juveniles sentenced to long prison terms, not just those sentenced to life in prison, are eligible to receive sentence reductions.  The new language also de-emphasizes the facts of the particular offense for which a juvenile was initially sentenced. Finally, the revised IRAA states that a resentencing court "[m]ay issue a sentence less than the minimum term otherwise required by law."  D.C. Code § 24-403.03(e)(2)(a).  The plain text of

the amended statute, as well as the accompanying Committee Report, indicates that the D.C.

Council intended for these amendments to "clarify" the IRAA and expand eligibility for its

sentencing review process.  See 2018 Comm. Rep. at 8, 14.

   The Court's understanding of the IRAA is also informed by statements of

Councilmember Charles Allen, then the Chairperson of the Committee on the Judiciary and

Public Safety, who was involved in the IRAA's drafting.  Councilmember Allen explained the

purpose of the IRAA in a letter to the U.S. Attorney for the District of Columbia.  See White Ex.

3 (Charles Allen Letter to U.S. Attorney, dated March 11, 2019).  Councilmember Allen wrote

that the IRAA was revised because the "nature of the original offense is irrelevant" to courts'

determinations of dangerousness and the interests of justice, as all juveniles serving life or

lengthy sentences have committed serious offenses.  Id.  Councilmember Allen also expressed

concern that prosecutors were "improperly using the facts of the original cases to justify the

petitioners' continued incarceration," which "contravenes the plain meaning of the statute and

the Council's intent."  Id.  The IRAA does not "require perfection" of the petitioners seeking

sentence modifications; instead, its focus is on remedying the harms associated with the

imposition of "lengthy sentences for crimes committed by juveniles and young adults [that] are

developmentally inappropriate, present public safety challenges, and should be reevaluated as

time passes."  Id.  The legislative purpose in enacting and amending the IRAA sheds significant

light on how the Court should consider its statutory factors.  See Mot. at 2-7; Hearing Tr.

at 9:20-10:10 (defense counsel arguing that, by amending the IRAA, the D.C. Council

"cemented" the focus of the IRAA "on a person's rehabilitation and not on his adolescent actions

years ago").

### III.  LEGAL STANDARD

As is relevant here, the IRAA requires a sentencing court to reduce a person's term of imprisonment where: (1) that person was convicted of offenses committed prior to their eighteenth birthday; (2) that person has served at least fifteen years in prison after having been sentenced to an indeterminate sentence pursuant to D.C. Code § 24-403; and (3) a court finds, after conducting a holistic evaluation of the statutory factors listed in Subsection 24-403.03(c), that the person is "not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification."  D.C. Code § 24-403.03(a).[3]  The D.C. Court of Appeals has characterized this inquiry as "essentially equivalent to the standard for granting parole" under the D.C. Code.  Williams v. United States, 205 A.3d 837, 848 (D.C. 2019).  In D.C., granting parole requires finding that "there is a reasonable probability that a prisoner will live and remain at liberty without violating the law," and that his release "is not incompatible with the welfare of society."  D.C. Code § 24-404(a).  Subsection (c) of the IRAA provides eleven factors that courts must consider when making determinations about future dangerousness and the interests of justice.  See D.C. Code § 24-403.03(c).

The Court is vested with broad discretion under the IRAA in fashioning a response to Mr. White's motion.  See Williams v. United States, 205 A.3d at 847.  The IRAA and related sentencing laws provide for the imposition of probation, supervised release, and

---

[3]     There have been three iterations of the IRAA. The first was effective from April 4, 2017 through May 9, 2019; the second from May 10, 2019 through April 26, 2021; and the third from April 27, 2021 through the present.  See D.C. Code § 24-403.03.  The statute provides that, for proceedings that were pending when the IRAA was amended in 2021, the version in force at the time the proceedings commenced shall apply.  D.C. Code § 24-403.03(f) ("The version of this section that was effective from May 10, 2019, to April 27, 2021 . . . shall apply to all proceedings under this section in any District of Columbia court, including any appeals thereof, that were pending prior to April 27, 2021.").

partial relief, depending on the offense and the characteristics of the IRAA petitioner.  Id.; see

D.C. Code §§ 24-403.01, 24-903.  While the IRAA does not explicitly address whether and to

what extent courts may impose probation conditions, courts are generally afforded discretion and

flexibility in fashioning appropriate conditions for post-incarceration supervision.  Burns v.

United States, 287 U.S. 216, 220-21 (1932).  See, e.g., United States v. Sullivan, 451 F.3d 884,

895 (D.C. Cir. 2006) (sentencing courts are generally "afforded wide discretion when imposing

terms and conditions of supervised release") (quoting United States v. Henkel, 358 F.3d 1013,

1014 (8th Cir. 2004)); United States v. Carmona, Mag. No. 18-0066, 2021 WL 6642274, at *4

(D.D.C. Aug. 10, 2021) ("The Court has broad discretion to oversee a defendant's probation.").

Courts may impose "reasonable" conditions that deprive a person of "some freedoms enjoyed by

law-abiding citizens," particularly when those conditions promote rehabilitation and reduce the

risk of recidivism.  United States v. Knights, 534 U.S. 112, 119 (2001).  The Court can design

probation conditions as necessary to ensure Mr. White's safe and successful reentry.

## IV.  DISCUSSION

### A.  IRAA Threshold Requirements

To qualify for a sentence reduction under the IRAA, a person must (1) have been

convicted as an adult of an offense committed prior to his eighteenth birthday; (2) have been

sentenced under the D.C. Code pursuant to Section 24-403, Section 24-403.01, or committed

pursuant to Section 24-903; and (3) have served at least fifteen years in prison.  D.C. Code

§ 24-403.03(a)(1) (2019).

That Mr. White meets these threshold requirements is not contested.  See Gov't

Opp. at 13.  Mr. White was seventeen years old at the time of the offenses for which he is

currently incarcerated.  See Judgment at 1; Indictment at 2.  He was sentenced to a term of

imprisonment of thirty-eight-and-one-third years to life under Section 24-403 of the D.C. Code.
See Judgment at 2; Nov. 22, 2010 Order.  And to date, Mr. White has served more than twenty-
six years in prison.  See White Ex. 9 (Sentence Monitoring Computation Data) (indicating that
Mr. White has been incarcerated for these offenses since November 26, 1996).

### B.  Statutory Factors

The IRAA next requires the Court to determine whether a person is "a danger to
the safety of any person or the community" and whether "the interests of justice warrant a
sentence modification."  D.C. Code § 24-403.03(a)(2).  If the Court determines that a person
does not pose a danger to any other person or the community, and that the interests of justice
warrant a sentence modification, the Court shall reduce that person's term of imprisonment.
D.C. Code § 24-403.03(a).  Section 24-403.03(c) of the IRAA provides eleven factors for the
court to consider when conducting this inquiry.  D.C. Code §§ 24-403.03(c)(1)-(11).

### 1.  Mr. White's Age at the Time of the Offense

Mr. White was seventeen years and eight months old at the time of the offenses
for which he seeks a sentence reduction.  His age at the time of his offenses weighs in his favor.
As originally enacted, the IRAA permitted incarcerated people to seek sentence reductions for
offenses committed before their eighteenth birthday.  D.C. Code § 24-403.03(b)(1) (2017).  As
amended, the IRAA currently permits individuals to apply for sentence reductions for offenses
committed before their twenty-fifth birthday.  D.C. Code § 24-403.03(b)(1).[4]  Particularly in

---

[4]     Mr. White filed his Motion for Reduction of Sentence on September 22, 2020,
before the statute was amended from eighteen to twenty-five.  He does not contend that the
current version of the statute is applicable to him, though he does not have to, as he would be
eligible under either version of the statute.  See D.C. Code § 24-403.03(f).  Subsequent
amendments to the IRAA are relevant here only to demonstrate the D.C. Council's intent when it

light of the D.C. Council's expansion of the IRAA, the fact that Mr. White was seventeen at the time of these offenses weighs in favor of a sentence reduction – even though he was only a few months shy of his eighteenth birthday at the time.  See Hearing Tr. at 23:1-4 (government counsel noting that Mr. White "hadn't [just] turned seventeen" at the time of these offenses); White Ex. 61, United States v. Auguste, at 11 (granting IRAA motion where applicant was fewer than four months shy of his eighteenth birthday).[5]

       This conclusion is consistent with the legislative intent in enacting and amending the IRAA, as well as abundant precedent from the U.S. Supreme Court concluding that "children are constitutionally different from adults for purposes of sentencing."  Miller v. Alabama, 567 U.S. 460, 471 (2012).  See also Montgomery v. Louisiana, 577 U.S. 190, 206 (2016) ("[C]hildren are constitutionally different from adults in their level of culpability."); Graham v. Florida, 560 U.S. 48, 68 (2010); Roper v. Simmons, 543 U.S. 551, 569-70 (2005).  When designing the IRAA to provide juvenile offenders with a "realistic opportunity to obtain release," Graham v. Florida, 560 U.S. at 79-82, the D.C. Council considered not only new research in child psychology and neuroscience, but also Supreme Court decisions addressing similar scientific developments.  See 2016 Comm. Rep. at 3, 14.  And, as the Supreme Court has recognized, the "qualities that distinguish juveniles from adults do not disappear when an individual turns [eighteen]."  Roper v. Simmons, 543 U.S. at 574.  The research embraced by the

---

comes to juvenile resentencing, as well as the IRAA's consistency with evolving science on juvenile brain development.

     [5]    A number of judges of the Superior Court have granted IRAA motions of applicants who were seventeen at the time of their offenses.  See, e.g., White Ex. 56, Gibson v. United States; White Ex. 55, United States v. Winstead; White Ex. 57, United States v. Leaks; White Ex. 59, United States v. Johnson.

D.C. Council and reflected in Supreme Court decisions applies squarely to Mr. White, who was

seventeen years and eight months old at the time of these offenses.

2.  Mr. White's History and Characteristics

The Court must next consider Mr. White's "history and characteristics."  D.C.

Code § 24-403.03(c)(2).  Prior to the IRAA's amendment in 2019, this factor also instructed

courts to consider "[t]he nature of the offense."  See D.C. Code § 24-403.03(c)(2) (2017).

Generally, when the legislature "acts to amend a statute, [this Court] presume[s] it intends its

amendment to have real and substantial effect."  Stone v. INS, 514 U.S. 386, 397 (1995); see

McCray v. McGee, 504 A.2d 1128, 1130 (D.C. 1986).  With the 2019 amendments, the D.C.

Council struck "the nature of the offense" from Subsection (c)(2), which now exclusively

instructs courts to consider the "history and characteristics of the defendant."  D.C. Code

§ 24-403.03(c)(2).  A number of Superior Court judges have concluded that this amendment

must be understood to mean that the Court should not consider the offense for which a person is

incarcerated in its analysis of this factor – instead, the Court should consider only a person's pre-

offense history and characteristics.[6]  To be clear, this amendment does not preclude the Court

---

[6]        See White Ex. 41, United States v. McDowell, at 6 ("The removal of '[t]he nature
of the offense' indicates that the court should no longer consider the facts of the crime itself. . . .
[T]he court will consider the characteristics and history of the defendant leading up to the
offense.") (emphasis added); White Ex. 62, United States v. Parker, at 6 (same); White Ex. 39,
United States v. Stewart, at 4-5, 12-13 (discussing the omission of the "nature of the offense"
language and declining to consider the offense conduct when evaluating Mr. Stewart's history
and characteristics); White Ex. 42, United States v. Plummer, at 4-5, 7-8 (same); White Ex. 63,
United States v. Houston, at 9 n.7, 11-13 (noting that the legislature "removed as an explicit
factor for consideration 'the nature of the offense'" and considering only pre-offense history and
characteristics). See also White Ex. 3 (Charles Allen Letter to U.S. Attorney, dated March 11,
2019) (noting that "the nature of the original offense is irrelevant" because all petitioners eligible
under the IRAA have committed serious offenses and that "using the facts of the original case to
justify the petitioners' continued incarceration . . . contravenes the plain meaning of the statute
and the Council's intent").

from considering the underlying offense conduct, and the Court is explicitly required to consider the offense conduct when assessing a different IRAA factor.  See D.C. Code § 24-403.03(c)(9) (extent of a person's role in the offense).  The D.C. Council's omission of the "nature of the offense" language thus only prohibits the Court from incorporating the details of the offenses for which Mr. White was sentenced into its evaluation of Mr. White's history and characteristics.

Like many IRAA applicants, Mr. White experienced a substantial amount of adversity and trauma during his childhood.  See, e.g., White Ex. 39, United States v. Stewart, at 12 (Mr. Stewart's history "tell[s] the story of a youth marked by trauma, neglect[,] and violence leading to the offenses committed when he was 16 years old"); White Ex. 62, United States v. Parker, at 7 ("The government does not dispute that Mr. Parker experienced a traumatic childhood."); White Ex. 60, United States v. Downing, at 11 (describing the murder of Mr. Downing's sister and father, the abuse that Mr. Downing's mother inflicted on him, and how Mr. Downing was affected by drug use and poverty).  Mr. White is an only child, although – according to his aunt, Delores Nelson – Mr. White's mother experienced a number of still-births and miscarriages.  See White Ex. 29 (Delores Nelson Letter); Mot. at 8.  Mr. White himself experienced gestational difficulties and was born preterm, factors that correlate with "controlling parenting strategies that undermine and harm a child's development" and are more likely to lead to "negative outcomes such as poor self-regulation [and] behavioral problems."  Mot. at 8-10 (summarizing literature on pregnancy, child development, and parenting).  Mr. White's recollection of his relationship with his mother reflects a "disordered pattern" of excessive parental control and rebellion, which contributes to this Court's understanding of Mr. White's behaviors when he was a teenager.  Id.; see also infra Subsection IV.B.8 (discussing Mr. White's family and community circumstances at the time of the offenses).

Mr. White was exposed to violence, drugs, and alcohol at an early age.  He and

his family members recall losing multiple neighbors to gun violence, and Mr. White himself

witnessed four shootings – two of them fatal – between the ages of ten and twelve.  Mot. at 12;

see White Ex. 30 (2019 Personal Statement) ("I've always seen hostility and violence, crime and

drugs.").  ████████████████████████████████████

████████████████████████████████████████

████████████████████████  He grew up in close proximity to public housing

developments where drug use was widespread, and he recalls that he began to use drugs and

alcohol regularly around the age of thirteen or fourteen to help blunt the pain he experienced as a

young child.  Id. at 10, 23; see White Ex. 23 (2017 Challenge Program Docs.) (diagnostic

interview describing Mr. White's history of substance use).  Mr. White now recognizes that drug

and alcohol use factored into the circumstances surrounding his early offenses.  See id.; Mot.

at 26, 32.

Between the ages of fourteen and seventeen, Mr. White had multiple contacts

with the criminal legal system, ███████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████████████

After committing these offenses, Mr. White spent time in several juvenile detention facilities,

including the D.C. Receiving Home for Children, Triangle Shelter House, and Oak Hill Youth

Detention Facility.  See PSR ¶ 17; Mot. at 27-28.  ████████████████████

████████████████████████  Mr. White experienced additional

abuse at these facilities.  For example, while at the D.C. Receiving Home for Children, Mr. White was "physically abused on a <u>daily</u> basis," "physically beaten each night," and "unable to sleep," leading to an order by the Juvenile Court that he be kept "separated and escorted <u>at all times</u>" while in custody.  Mot. at 27-28; <u>see</u> White Ex. 6 (Juvenile Detention Mot.) (requesting that Mr. White be moved to a different facility due to the violence he experienced at Receiving House); White Ex. 7 (Juvenile Order) (declining to release Mr. White from juvenile detention but ordering his separation from other children and constant supervision by staff).

Judges of the D.C. Superior Court have concluded that a person's struggles during their childhood and adolescence are relevant to understanding that person's later criminal conduct, even though a troubled adolescence cannot fully justify or explain why someone later commits a violent crime.  <u>See</u> e.g., White Ex. 59, <u>United States v. Johnson</u>, at 13 ("[A]lthough Mr. Johnson's difficult upbringing certainly does not excuse his actions, it does place his personal culpability in a more forgiving light."); White Ex. 63, <u>United States v. Houston</u>, at 13 ("Mr. Houston's family trauma and diagnosed mental health issues cannot be divorced from the crimes he committed.").  The Court agrees that Mr. White's violent conduct cannot be separated or viewed independently from the violence he experienced during his childhood and adolescence.

The government contends that Mr. White's juvenile record indicates that he remains a danger to society. █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████



███████████████████████████████████████

███████████████████████████████

The government does not dispute that Mr. White "generally had a troubled background." Gov't Opp. at 19. The Court finds that Mr. White experienced "many years of extreme complex trauma during his 17 years prior to incarceration." Shields Rep. at 34. "These traumas no doubt shaped and influenced much of who he was, and much of what he did." Id. Mr. White's history and characteristics weigh in favor of a sentence reduction.

### 3. Mr. White's Compliance with Institutional Rules and Completion of Educational, Vocational, and Other Programming

The Court must next consider whether Mr. White "has substantially complied with the rules of the institution to which he [] has been confined" and whether he "has completed any educational, vocational, or other program, where available." D.C. Code § 24-403.03(c)(3). Courts should consider "the full context of an individual's prison disciplinary history." United States v. Mercer, Crim. No. 1996 FEL 001061, 2019 WL 11541302, at *5 (D.C. Super. Ct. Sept. 3, 2019). The government argues that Mr. White's disciplinary record demonstrates his unwillingness "to conform his behavior to [] rules and regulations" and suggests potential dangerousness. Gov't Opp. at 16-17. This Court disagrees with the government's interpretation of Mr. White's conduct while incarcerated and commends Mr. White on his diligent pursuit of programming designed to ease his reentry process.

#### a. Compliance with Facility Rules

Mr. White has been transferred to a number of prison facilities around the country during his many years of incarceration. Between 1998 and 2001, Mr. White was primarily incarcerated at the Lorton Correctional Complex in Virginia, a now-closed facility that was

20

overcrowded and void of appropriate rehabilitative programming, particularly for young offenders such as Mr. White.  Mot. at 41-42 (citing a D.C. Department of Corrections press release on the closing of the Lorton facility).  In 2001, when Mr. White was twenty-two years old, he was transferred to the federal penitentiary in Leavenworth, Kansas, more than 900 miles from his family in the District of Columbia.  Id. at 42, 45; see White Ex. 10 (Inmate Location History).  From there, the Bureau of Prisons transferred him from penitentiary to penitentiary, moving him to and from facilities in Colorado, Pennsylvania, Louisiana, Florida, Kentucky, and Virginia, until he was finally moved to the Central Detention Facility ("D.C. Jail") in the District of Columbia in 2020.  Mot. at 39-56.  Understaffing, overcrowding, and brutality plagued each institution in which he resided.[7]

---

[7]     Mr. White's motion describes at length the "deplorable" conditions of the prisons where he was incarcerated, and the government does not appear to dispute the factual assertions about these facilities.  See Hearing Tr. at 5:1-8 ("[Mr. White has] now been in prison for more than twenty-four years.  That means that he has spent more than half of his life behind prison walls. . . .  He's been imprisoned in some of the most dysfunctional, hard[est] of the penitentiaries in the system."); see generally Hearing Tr.; Gov't Opp.  In support of his contentions that he was housed in particularly harsh and dysfunctional facilities, Mr. White cites multiple news reports, a testimonial from former Federal Bureau of Prisons employee Jack Donson, a D.C. Department of Corrections report, a U.S. Department of Justice press release, a court decision, and academic literature describing the conditions of prison facilities like those where he was incarcerated.  See Mot. at 39-52.

    See, e.g., Linda Wheeler, No Escaping the History of Lorton Prison, WASH. POST (Feb. 7, 1999), https://www.washingtonpost.com/archive/local/1999/02/07/no-escaping-the-history-of-lorton-prison/9f8230d9-e33c-4b3f-b4fe-136570930735/ <https://perma.cc/RZ7A-AGWZ>; Eddie Dean, Maximum Insecurity: Overcrowded and understaffed, Lorton Prison is on death row, WASH. CITY PAPER (June 6, 1997), https://www.washingtoncitypaper.com/news/article/13013216/maximum-insecurity <https://perma.cc/K5HQ-RX3L>; D.C. DEP'T OF CORRS., Department of Corrections Closes Final Prison And Accomplishes Major Milestone (Nov. 19, 2001), https://doc.dc.gov/release/department-corrections-closes-final-prison-and-accomplishes-major-milestone <https://perma.cc/C2RU-9CMG>; HUM. RTS. WATCH, Red Onion State Prison: Super-Maximum Security Confinement in Virginia (Apr. 1999), https://www.hrw.org/legacy/reports/1999/redonion/ <https://perma.cc/24FJ-UZP3>; White Ex. 14 (Jack Donson Aff.); D.C. CORRS. INFO. COUNCIL, USP Big Sandy: Inspection Report, at 2-8

During the twenty-six years that he has been incarcerated in federal prisons, Mr. White has accumulated seventeen disciplinary incidents. See White Ex. 11 (Inmate Discipline Data); Supplement [Dkt. No. 133] at 5. Five of those incidents occurred before his twenty-fifth birthday, and the vast majority of those incidents occurred before he turned thirty. White Ex. 11 (Inmate Discipline Data). He is now forty-four years old. Since 2008, Mr. White has been sanctioned only four times. Id.; see Supplement [Dkt. No. 133] at 5. In 2013, Mr. White was disciplined once for fighting with another incarcerated person and once for being in an unauthorized area. Id. He then maintained a clear record between 2013 and 2019, at which point he was sanctioned for the possession of a cell phone. Id. Most recently, in 2021, a young man incarcerated at the D.C. Jail instigated a fight with Mr. White for which both of them received disciplinary write-ups. Supplement [Dkt. No. 133] at 4-5.

The chronology of Mr. White's disciplinary history is at odds with the government's assertion that Mr. White has "flaunted" prison regulations "with regularity." Gov't Opp. at 16. Instead, Mr. White's disciplinary history suggests that he struggled as a young man to acclimate to a brutal prison environment, but throughout the last fifteen years, he has

---

(Oct. 21, 2019) https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Big%20Sandy%20Inspection%20Report%20FINAL%20with%20BOP%20response%2010-21-19.pdf <https://perma.cc/TV7B-6EXD>; News Release, Federal Inmate Sentenced To Life In Federal Prison For the Murder Of A Fellow Inmate, Dep't of Just. (Sep. 26, 2013), https://www.justice.gov/usao-mdfl/pr/federal-inmate-sentenced-life-federal-prison-murder-fellow-inmate <https://perma.cc/Q6ZF-6U2W>; Ruling on Motion for Summary Judgment, Roque v. United States, Civil Action No. 09-cv-533 [Dkt. No. 61] (D. Conn. Feb. 27, 2012) (describing conditions at USP Lewisburg); Karen M. Morin, "Security Here is Not Safe": Violence, Punishment, and Space in the Contemporary U.S. Penitentiary, 31 Env't & Plan. D: Soc'y & Space 381, 383-384 (2013), https://digitalcommons.bucknell.edu/cgi/viewcontent.cgi?article=1745&context=fac_journ <https://perma.cc/MG9G-9L7F>; Pete Early, The Hot House:  Life Inside Leavenworth Prison 31 (1992).

largely complied with institutional requirements.  See Mot. at 44-57; White Ex. 14 (Jack Donson Aff.) at 3-4.  As former Bureau of Prisons correctional treatment specialist Jack Donson explained, "it is not unusual for inmates to receive incident reports in the penitentiary environment, especially young adults arriving from the [District of Columbia] system."  White Ex. 14 (Jack Donson Aff.) at 3.[8]  Mr. White's disciplinary history suggests that Mr. White "succumbed to the pressures of the chaotic, predatory [prison] environment," which Mr. Donson observes frequently among IRAA applicants.  Id.

Mr. White's disciplinary history also must be understood within the context of the facilities in which he was housed.  As Superior Court Judge Michael K. O'Keefe has noted, it "can be a herculean task to refrain from disciplinary infractions" while in prison, and a person's behavior while incarcerated is necessarily "shaped by environmental forces."  White Ex. 55, United States v. Winstead, at 11.  Mr. White asserts that institutions like Lorton, where he was first incarcerated, "trained him to become more, rather than less, aggressive" in order to protect himself from violence, including sexual violence, at the hands of correctional officers and other incarcerated people.  Mot. at 40.  Mr. Donson's affidavit suggests the same.  Mr. Donson explains that federal penitentiaries are "violent institutions across the board where inmates feel compelled to carry sharpened instruments for self-protection."  White Ex. 14 (Jack Donson Aff.) at 4.  While incarcerated, Mr. White bore witness to "repeated violence and killings" and was immersed in an environment where people felt the need to "arm themselves simply for protection

---

[8]       Jack Donson was employed by the Federal Bureau of Prisons for twenty-three years as a Correctional Treatment Specialist and Case Management Coordinator.  White Ex. 14 (Jack Donson Aff.) at 1, Appendix A.  While at the Bureau of Prisons, he provided case management and counseling services to incarcerated people, focusing on security classification, program placement, and reentry services.  Id. at 1.  He previously worked as a probation officer in Pennsylvania and has helped found two consulting organizations that specialize in federal prison reform and providing education about the federal prison system.  Id. at Appendix A.

rather than exploitation." Id.; Mot. at 49.  That Mr. White accumulated several disciplinary infractions early in his incarceration thus does not prevent him from demonstrating that he poses no danger to the community should he be released.

      The IRAA requires the Court to consider whether Mr. White has "substantially complied" with the rules of the institutions where he has been incarcerated.  D.C. Code § 24-403.03(c)(3) (emphasis added).  As part of this inquiry, the Court should examine the number and nature of Mr. White's disciplinary infractions as well as periods of sustained compliance.  See, e.g., White Ex. 61, United States v. Auguste, at 13 (noting that Mr. Auguste had gone over five years without an infraction at the time of his IRAA hearing).  Ten years ago, in 2013, Bureau of Prisons officials wrote that Mr. White had "made a sincere and successful effort to establish an extended period of clear conduct and [had] been consistently active in programming."  White Ex. 19 (December 21, 2012 Request for Transfer).  In 2018, Bureau of Prisons officials noted that Mr. White had "maintained clear conduct since August 2013, and has been clear of any Greatest Severity Incident Reports for over 10 years.  [Mr.] White has a good rapport with staff and fellow inmates at this facility."  White Ex. 24 (January 31, 2018 Request for Transfer).   As a result of this good behavior, Mr. White earned his transfer to a lower-security facility in 2018.  Mot. at 56; see White Ex. 10 (Inmate Location History).

      In sum, although his initial transition to prison was admittedly rocky, Mr. White has demonstrated substantial compliance with prison regulations, especially over the past fifteen years – a very significant period of time.  And, under the IRAA, Mr. White's disciplinary record need not be perfect for it to weigh in favor of a sentence reduction.  See White Ex. 39, United States v. Stewart, at 13 (finding substantial compliance despite a total of thirty-two sanctions); White Ex. 40, United States v. Carpenter, at 7 (considering the "positive trajectory" of a person's

disciplinary record and recognizing the challenges of "acclimating to being incarcerated in a notoriously violent [Bureau of Prisons] penitentiary").

      b.  <u>Completion of Educational, Vocational, and Rehabilitative Programming</u>

During his twenty-six years of imprisonment, Mr. White has engaged in more than 2,300 hours of educational, vocational, and rehabilitative programming.  <u>See</u> White Ex. 12 (Inmate Education Data).  He began taking GED classes in 2001, and he earned his GED in 2004.  <u>Id</u>.; <u>see</u> White Ex. 14 (Jack Donson Aff.) at 4-5; Mot. at 56.  He has taken classes in etiquette and communication, anger management, Black history, and financial wellness.  White Ex. 12 (Inmate Education Data).  Mr. White has not only worked consistently at the facilities where he has been incarcerated, <u>see</u> White Ex. 18 (Work History), but he has also devoted many hours to classes preparing him for post-incarceration employment, including 360 hours of Welding Technology, 360 hours of Culinary Arts, 300 hours of Major Appliance Repair, 100 hours of Reentry: Positive Outcomes, 150 hours in Data Entry Operator training, 150 hours to receive a Receptionist certificate, and a ten-hour veterinary course.  <u>See id</u>.; White Ex. 12 (Inmate Education Data); White Ex. 68 (OSHA Veterinary Course); Mot. at 51, 54-55.  Importantly, he has also participated in courses such as Victim Impact Awareness and Stop the Violence, through which he reflected on the impact of his actions and his own experiences with violence as a child.  Mot. at 55; White Ex. 12 (Inmate Education Data).

In October 2016, Mr. White completed the Non-Residential Drug Abuse Program ("NRDAP"), a voluntary cognitive-behavioral treatment program that "includes a variety of clinical activities organized to treat complex psychological and behavioral problems."  Directory of National Programs, FED. BUREAU OF PRISONS, at 13 (Nov. 21, 2016) https://ia801504.us.archive.org/15/items/www.bop.gov/inmates/custody_and_care/docs/BOPNat

ionalProgramCatalog.pdf <https://perma.cc/HQY5-MPR7> ("Directory of National Programs");
see White Ex. 14 (Jack Donson Aff.) at 6.  The NRDAP runs for twelve to twenty-four weeks,
during which participants engage in ninety-minute or two-hour meetings with other group
members each week.  Id.; see Program Statement No. P5330.11, Psychology Treatment
Programs, FED. BUREAU OF PRISONS, at § 2.4.4 (Mar. 16, 2009)
https://www.bop.gov/policy/progstat/5330_011.pdf <https://perma.cc/9RU4-T55L>
("Psychology Treatment Programs").  The program covers skills such as recovery maintenance,
dealing with social pressure, and the intersection between criminal behavior and substance abuse.
White Ex. 14 (Jack Donson Aff.) at 6.  NRDAP staff noted that Mr. White was a "good
participant" who was "open with his group and many times ask[ed] for feedback on certain
situations."  White Ex. 21 (NRDAP Docs.).  Staff further noted that Mr. White discussed "the
personal issues that he needs to address with his substance use and his criminal thinking" and
"how to identify his emotions and manage them as he experiences them so they do not present in
other less rational behaviors."  Id.  During the program, Mr. White considered challenges he
would "face upon release that may trigger relapse" and developed strategies for dealing with
each challenge.  Id.

    Mr. White's participation in NRDAP contributes substantially to the Court's
conclusion that Mr. White "will live and remain at liberty without violating the law" once
released, and accordingly, persistent drug testing throughout his term of probation likely will not
be necessary to deter Mr. White from using illegal drugs.  See D.C. Code § 22-404(a); Williams
v. United States, 205 A.3d at 848.  Although the Probation Office and government recommend
that Mr. White submit to substance abuse testing throughout the duration of his probation, see
July 13, 2023 U.S. Probation Office Mem. at 2-3; United States' Response to Probation

Memoranda and Court Order [Dkt. No. 150-1] at 3, this condition is not necessary in light of Mr.

White's drug treatment history.  Mr. White has acknowledged that his previous substance abuse

contributed to his criminal conduct.  See Shields Rep. at 16.  At this point, however, he does not

demonstrate any active substance abuse problems.  Id. at 41; see Response to Probation

Memoranda and Court Order [Dkt. No. 147-1] at 5-6.  Mr. White suggests that his only

documented substance abuse occurred pre-incarceration, during his adolescence, and that this

substance use is "too attenuated" to justify the extensive drug testing that the Probation Office

recommends.  Id.  Mr. White's history of substance abuse is decades old, and he has completed

extensive substance abuse programming while incarcerated.  See White Ex. 21 (NRDAP Docs.);

White Ex. 17 (Drug Abuse Class Tr.).  The Court agrees with the Probation Office and the

government that requiring Mr. White to be randomly tested for substance use during his first

ninety days of probation, rather than throughout his entire probation period, is appropriate.[9]

   While incarcerated at FCI Bennettsville, Mr. White completed the "Inside Out of

Being a Man" program, where he learned skills necessary for a safe and successful reentry.

Hearing Tr. at 7:2-22 (defense counsel describing the progress Mr. White made through

completing the Inside Out of Being a Man program).  His supervisor in that program, Jeremy

Tillman, wrote that Mr. White was "exemplifying exceptional work ethics" and that he believed

Mr. White would "become a very productive member of the Nation's work force" upon release.

---

[9]  As a condition of his probation, Mr. White will reappear before the Court in about
ninety days for a Reentry Progress Hearing.  Prior to the hearing, the Probation Office will
"submit a report summarizing . . . [Mr. White's] compliance with release conditions."  July 13,
2023 U.S. Probation Mem. at 3.  At that hearing, the Court – with the help of counsel and the
Probation Office – will evaluate Mr. White's transition back into the community and determine
whether to modify or add conditions of his probation.  See id.  If additional testing proves
necessary, it may be imposed as a condition at the Reentry Progress Hearing.  If not, random
drug testing will be discontinued.

White Ex. 25 (CO Tillman Email).  Mr. Tillman characterized "Mr. White's improvement overall . . . as life changing."  Id.; Hearing Tr. at 7:2-22.  Mr. White has also participated in the CHALLENGE Program, a "cognitive-behavioral, residential treatment program developed for male inmates in penitentiary settings."  Directory of National Programs at 10.  Mr. White completed 407 hours of the program in 2016 and 161 hours of the program in 2017.  White Ex. 22 (2015-16 Challenge Program Docs.); White Ex. 23 (2017 Challenge Program Docs.); White Ex. 14 (Jack Donson Aff.) at 5; see Mot. at 53-55.  Although financial hardship ultimately led Mr. White to withdraw from the CHALLENGE program following his mother's death, he still benefited from his time in the program and continued to work towards self-improvement.  White Ex. 23 (2017 Challenge Program Docs.); Mot. at 54-55.

In 2020, Mr. White was moved to the D.C. Jail and housed in the Education Unit. Mot. at 59.  Since his move, Mr. White has taken online courses, created a resume, and utilized an online job center to understand the skills he will need to maintain employment upon release. See id.; White Ex. 26 (D.C. Jail Transcript & Certificates).  While this motion has been pending, he has completed multiple job training courses, as well as courses through the Juris Libertas program at the University of the District of Columbia's David A. Clarke School of Law.  See White Ex. 65 (February 2022 Letter & Certificates); White Ex. 53 (Ashley Taylor Letter); White Ex. 70 (LEAD Up! Classes).  These efforts, in conjunction with the extensive vocational programming Mr. White has participated in while incarcerated, demonstrate that Mr. White is capable of being a productive member of society.

Considering Mr. White's disciplinary record holistically, coupled with his determination to take advantage of vocational and educational programming while incarcerated, this factor weighs strongly in favor of a sentence reduction.

4.  Recommendation from the United States Attorney

The IRAA requires the Court to consider the position of the U.S. Attorney, <u>see</u> D.C. Code § 24-403.03(c)(4), who opposes a sentence reduction in this case.  <u>See generally</u> Gov't Opp.  The government argues that, more than two decades later, Mr. White has failed to take responsibility for "his horrendous and senseless murder of a postal carrier who had done absolutely nothing to [Mr. White]."  <u>Id</u>. at 1.  The government also emphasizes Mr. White's disciplinary record during his incarceration and his juvenile record.  <u>Id</u>. at 13-16.  The Court understands the government's position.  Although the Court disagrees with the government, this factor weighs against a sentence modification.

5.  Demonstration of Maturity, Rehabilitation, and Fitness to Reenter Society

The IRAA next requires the Court to consider whether Mr. White has "demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction."  D.C. Code § 24-403.03(c)(5).  The Court has already described how Mr. White has made strides toward rehabilitation and has demonstrated his fitness to reenter society by completing numerous educational and vocational courses.  <u>See supra</u> Subsection IV.B.3.b.  In addition, he has been largely free of disciplinary infractions since 2008.  <u>See supra</u> Subsection IV.B.3.a.  Additional considerations inform the Court's assessment of this factor, as well.

The United States has asserted that Mr. White "does not fully acknowledge the degree of his responsibility" for his offenses and attempts to "minimize his culpability."  Gov't Opp. at 1, 20.  This assertion is contradicted by much of the record before the Court.  At the evidentiary hearing on April 7, 2021, as well as at the resentencing hearing on August 3, 2023, Mr. White addressed the Court and demonstrated profound reflection and maturity.  Hearing Tr. at 38-40.  He explained that, when the underlying offenses occurred, "I was a misguided and

foolish young youth who committed a tragic life-altering act." Id. at 38:9-10.  He apologized to the victims and their families, and he explained, "[t]here has not been a day I don't regret what I've done as a teenager." Id. at 38:17-18; see White Ex. 32 (Letter to Kim Family); White Ex. 33 (Letter to Gregory Paul). ████████████████████████████████████

████████████████████████████████████

        Mr. White has consistently stated that he did not intend to fire the shot that killed Mr. Kim while at the same time acknowledging that it was wrong for him to carry a weapon in the first place.  Reply at 15-16; Hearing Tr. at 38-40; White Ex. 32 (Letter to Kim Family).  The Court does not interpret this as a minimization of culpability, particularly because Mr. White continues to acknowledge the "terrible wrongness of robbing others at gunpoint and is deeply pained that he killed Mr. Kim." Reply at 16.  Although Mr. White could not "fully appreciate the risks he was taking when he brandished that weapon" at seventeen years old, id., he recently wrote: "I have grown and matured [and] I've come to accept that majority of blame falls on me. I am truly sorry for what I have done." White Ex. 31 (2020 Personal Statement).  The United States contends that Mr. White's remorse does not outweigh the fact that he does not fully acknowledge his degree of responsibility for Mr. Kim's death.  Gov't Opp. at 1.  The Court disagrees.  Mr. White has accepted responsibility for his actions, initially by pleading guilty and more recently in his representations to the Court.  He has expressed remorse and has sought to make amends.  His actions demonstrate that Mr. White has matured during his incarceration.

        Mr. White's participation in a variety of programs while incarcerated further demonstrates his maturity and fitness to reenter society.  In 2019, Mr. White was chosen as a suicide watch companion.  Mot. at 58-59; Hearing Tr. at 39:3.  Suicide watch companions are selected, in part, "for their reputation within the institution." Program Statement No. P5324.08,

Suicide Prevention Program, Fed. Bureau of Prisons, at ¶ 13 (Apr. 5, 2007),

https://www.bop.gov/policy/progstat/5324_008.pdf <https://perma.cc/8URS-H89C> (describing

the Inmate Companion Program).  "[T]hey must be mature, reliable individuals who have

credibility with both staff and inmates," and who can "protect the suicidal inmate's privacy from

other inmates, while being accepted in the role by staff."  Id.

    Mr. White has also engaged in victim impact programming, through which he

gained an understanding of how his own victimization led him to harm others.  Reply at 5; White

Ex. 12 (Inmate Education Data).  He has completed substance abuse and relapse prevention

classes, see White Ex. 17 (Drug Abuse Class Tr.), and as for his participation in the Non-

Residential Drug Abuse Program, a clinician wrote that Mr. White "was a good participant

working through his criminal thinking and anger issues. . . .  He was able to share why he needed

to change and his desire to have the skills to live a pro-social life when released."  White Ex. 21

(NRDAP Docs.).  Furthermore, Mr. White has read voraciously and, while reading, has

consistently reflected on his experiences, choices, and future.  See White Ex. 51 (Letter to

Court); Supplement [Dkt. No. 133] at 3-4.  He has been an "enthusiastically engaged" member of

the Free Minds Book Club while at the D.C. Jail, where he has demonstrated his intelligence and

thoughtfulness.  White Ex. 48 (Kelli Taylor Letter); see supra at Subsection IV.B.3.b (describing

the programming Mr. White has completed while incarcerated).

    Recommendations from correctional staff also demonstrate Mr. White's fitness to

re-enter society.  Mr. White's supervisor at FCI Bennettsville, Jeremy Tillman, wrote the

following in February of 2019:

> [Mr.] White is still exemplifying exceptional work ethics and is
> enhancing his communication and facilities trade skills.  He has a
> willingness to learn and work with others as a team in order to
> complete unified goals.  I would characterize inmate White's

> improvement overall since I first met him as life changing and
> should he continue to demonstrate this level of motivation and work
> ethics when he is returned to the free world, I am led to believe that
> he will become a very productive member of the Nation's work
> force.

White Ex. 25 (CO Tillman Email).  Mr. Tillman also stated that Mr. White has "learned and now demonstrates many reentry skills that are necessary for success in free society."  Id.

Finally, despite being housed in prisons hundreds of miles from home, Mr. White has maintained and strengthened his relationships with his family members.  He regularly speaks on the phone with his cousins Kevin White and Alfreda Nelson, both of whom would allow Mr. White to reside with them following his release.  Mot. at 60; see White Ex. 27 (Kevin White Letter); White Ex. 47 (Alfreda Nelson Decl.); Residence Probation Mem. at 1.  Kevin White and Alfreda Nelson were both present at Mr. White's resentencing hearing on August 3, 2023.  In her letter of support, Ms. Nelson explains that over the years she has seen Mr. White "grow calmer and do good work, like when he was a suicide watch companion in prison."  White Ex. 28 (Alfreda Nelson Letter).  She says that Mr. White "wants to be a productive member of society with the help of counseling and any outreach programs that may be available to him.  He has the full support of his family and friends that [are] willing to help guide him in his transition back into society in any way possible."  Id.  Mr. White also regularly speaks with his aunt, Delores Nelson, and his uncle, Michael Nelson.  Mot. at 60.  In her letter of support, Delores Nelson states that "[s]ince he's been in prison, I've seen a change.  I spoke to [Mr. White] a couple of times a month and I noticed that I don't hear that anger anymore.  He is more open and he listens and we talk back and forth, I can tell he is listening to what others are saying now."  White Ex. 29 (Delores Nelson Letter).

The Court concludes that Mr. White has amply demonstrated his maturity, rehabilitation, and fitness to reenter society, all of which weigh greatly in favor of a sentence reduction.

### 6.  Victim Statements

The Court must take into consideration any statement "by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased." D.C. Code § 24-403.03(c)(6).  The United States has submitted a letter from the grandchildren of Mr. Kim, who oppose a sentence reduction.  See Gov't Ex. 1 (Victim Impact Letter).  Mr. Kim's grandchildren write that their grandfather was a veteran of the U.S. Army who "was truly representative of goodness in the world." Id.  They urge the Court to consider the suffering endured by their grandmother, Mr. Kim's widow, submitting that Mr. White's release would cause "psychological and emotional distress" and "wreak havoc" on her mental stability.  Id.  The Court takes very seriously the devastating impact on Mr. Kim's family. This factor weighs against Mr. White's release.

### 7.  Physical, Mental, or Psychiatric Examination and Report

The IRAA instructs courts to consider reports detailing any "physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals." D.C. Code § 24-403.03(c)(7).  On behalf of Mr. White, Dr. John M. Shields, Ph.D., ABPP, submitted a detailed mental health report, following a review of Mr. White's medical records, juvenile records, and an extensive interview with Mr. White.  See generally Shields Rep. ███

███████████████████████████████████████████████████

███████████████████

With regard to Mr. White's mental status, Dr. Shields concluded that Mr. White did not present symptoms of any diagnosable mental disorder and that Mr. White's mental status was within normal limits.  Shields Rep. at 6.  Dr. Shields did not observe any "hint of psychotic thought processes" in Mr. White, nor was there any "evidence of delusion ideation" or "neurocognitive impairment."  Id.  Dr. Shields's report suggests that extensive psychiatric treatment need not be a condition of Mr. White's safe reentry.  See id. at 5-6.  Nevertheless, as discussed at the August 3, 2023 hearing, Mr. White will submit to a mental health assessment as a condition of his probation to ensure that he will receive the kind of wraparound services that will ensure his safe transition back into the community.[10]



---

[10]    After completing a mental health assessment, the Probation Office may recommend that Mr. White complete a mental health treatment or counseling program.  The Court and the parties will address any such recommendations at the Reentry Progress Hearing.



[11]



Shields Rep. at 17 (emphasis added).



In light of all his findings, Dr. Shields concluded that "Mr. White's prognosis for community adjustment is good." Id. at 41. This report weighs in favor of the sentence reduction.



Mr. White's willingness to engage in therapeutic counseling ██████████

████████████████████ – and this Court's ability to require his participation in such counseling

as a condition of his probation – contributes substantially to this Court's finding that Mr. White

does not pose a risk to the community or its members.  See D.C. Code § 24-403.03(a).

### 8.  Family and Community Circumstances at the Time of the Offense

The IRAA requires the Court to consider Mr. White's "family and community

circumstances at the time of the offense, including any history of abuse, trauma, or involvement

in the child welfare system."  D.C. Code § 24-403.03(c)(8).  Mitigating family and community

circumstances, including early exposure to violence and strained family relationships, weigh in

favor of a sentence reduction.  See White Ex. 62, United States v. Parker, at 6-8, 17 (concluding

that a person's "sympathetic background sheds light on the circumstances preceding the

commission of the offense and favors a sentence modification").  See also supra Subsection

IV.B.2 (finding that Mr. White's history and characteristics weigh in favor of a sentence

reduction).

"Mr. White was born and raised in a family and community system where

violence, crime, and victimization were ubiquitous."  Mot. at 17; see White Ex. 30 (2019

Personal Statement).  Throughout his childhood, he lived with his mother, his cousins, and his

grandparents, first in Southeast D.C. and later in Maryland.  Mot. at 10-11.  He did not know his

father until he was twelve years old, and even then, the two did not have a close relationship.  Id.

at 23.  Mr. White's mother was punitive, overprotective, and confining, and he was often

"smacked and beaten" when she disciplined him.  Id. at 8, 17.  At home, he learned that violence

was a key self-preservation tool, and that if he showed passivity or weakness, he would be

victimized.  Id. at 17.  His relationship with his mother grew strained during his adolescence, and

he would often leave home to spend time with his peers in D.C.  Id. at 10.

The neighborhood where Mr. White grew up experienced "shootings every day or

every other day, extensive drug activity, and regular fights among the young people."  Mot.

at 11.  The "crowd that [Mr. White] became involved with as a young teenager used guns to rob

people."  Id. at 12.  Mr. White lost several members of his community to gun violence and

witnessed multiple shootings, including two deaths, before he turned thirteen.  Id.  He was also

exposed to drugs at an early age, and he, "like his peers, began regularly using marijuana and

PCP from the age of 13 or 14."  Id. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

The violence Mr. White endured during his childhood was exacerbated upon his

contact with the criminal legal system at age fourteen, when he experienced "retraumatization in

the dysfunctional D.C. juvenile justice system."  Mot. at 8.  Mr. White was incarcerated in

various group shelters and juvenile detention centers, including the D.C. Receiving Home for

Children, Triangle Shelter House, and the notorious Oak Hill Youth Detention Facility.  See id.

at 27-29; PSR ¶ 17; White Ex. 6 (Juvenile Detention Mot.).  Living conditions in these facilities

were egregious.[13]  While detained at these facilities, Mr. White was not protected from violence

---

[13]    Mr. White asserts, and the government does not contest, that the conditions in the
juvenile facilities where Mr. White was detained during his youth were particularly alarming.
For instance, the Oak Hill Youth Detention Facility featured a "wall of death" – an "entire wall
in one of the living units [that] was covered with [the] obituaries" of "Oak Hill youth who had
returned to the community [and] were victims of homicide."  Liz Ryan & Marc Schindler,
Notorious to Notable: The Crucial Role of the Philanthropic Community in Transforming the
Juvenile Justice System in Washington, D.C., at 8 (2012),

or provided access to educational and rehabilitative programming.  See Mot. at 28-29.  Mr.

White experienced such severe daily physical abuse while at the D.C. Receiving Home for

Children that the Juvenile Court ordered his separation from other residents at all times.  Id.

at 28; White Ex. 7 (Juvenile Order).  He repeatedly fled another facility, the Triangle Shelter

House, due to verbal abuse he endured from facility staff.  See PSR ¶ 17; Mot. at 28.  And Mr.

White remembers staff at the Oak Hill Youth Detention Facility encouraging children to fight

one another.  Mot. at 29.

       The government acknowledges Mr. White's "troubled background," but asserts

that the sentencing court was "aware of these circumstances and was able to take them into

account" in 1998, when Mr. White was initially sentenced.  Gov't Opp. at 19.  The government's

argument is inconsistent with the entire purpose of the IRAA.  See supra Section II (explaining

the legislative history and purpose of the IRAA).  By enacting and later amending the IRAA, the

D.C. Council encouraged courts to "tak[e] into account the family and home environment that

surrounds [a juvenile] – and from which he cannot usually extricate himself – no matter how

brutal or dysfunctional."  See 2016 Comm. Rep. at 93 (quoting Miller v. Alabama, 567 U.S.

at 477); D.C. Code § 24-403.03(c)(8).  The IRAA also reflects the Council's specific desire to

address deficiencies in the juvenile justice system, including the misguided notion that youth

offenders have no capacity for change.  See 2016 Comm. Rep. at 14; Reply at 12-13 (noting that

---

https://dyrs.dc.gov/sites/default/files/dc/sites/dyrs/publication/attachments/Notorious%20to%20
Notable.pdf <https://perma.cc/9R6V-5BGB>.  And, in 1995, D.C. Superior Court Judge George
W. Mitchell ordered the D.C. Receiving Home for Children shut down because the conditions
were "appalling" and "unacceptable for a civilized society."  See Nancy Lewis, D.C. Judge
Orders Shutdown of Children's Receiving Home, WASH. POST (Aug. 18, 1995),
https://www.washingtonpost.com/archive/local/1995/08/18/dc-judge-orders-shutdown-of-
childrens-receiving-home/ca9c681d-be6d-4f72-a7b7-153ddac48f02/ <https://perma.cc/PLJ6-
DUGK>.

the IRAA is meant to recognize that a teenager's choices "are not the sum total of that teenager's potential").

The original sentencing judge articulated his belief that Mr. White was "as poor a risk for rehabilitation as any that [the court has] seen" and accordingly imposed an indeterminate forty-years-to-life sentence. White Ex. 5 (Sentencing Hearing Tr.) at 28:1-3. Judge Greene's prediction and Mr. White's original sentence, however, were based on the facts available at the time and the egregiousness of Mr. White's criminal activity that led to Mr. Kim's death. Judge Greene imposed Mr. White's original sentence without the benefit of contemporary understandings of juvenile brain development and without a full recognition of how Mr. White's family and community circumstances influenced his behavior. See generally id. Counsel for Mr. White also asserts that the original sentence reflected a then-prevailing and mistaken belief that youth offenders were "super-predators who could not be reformed." Reply at 13-14. The IRAA was designed to address cases like Mr. White's, where a person has demonstrated their ability to mature and change. The Court finds that Judge Greene's prediction has been proved wrong.

The details of Mr. White's childhood and adolescence reveal "years of extreme complex trauma." Shields Rep. at 34. The community where he grew up, his experience in the juvenile justice system, and his family relationships at the time of his offenses are mitigating factors that weigh strongly in favor of a sentence reduction.

### 9.  Mr. White's Role in the Offense

The Court must also consider the extent of Mr. White's role in the underlying offense. D.C. Code § 24-403.03(c)(9). The government accurately characterizes Mr. White as "the main actor in this crime." Gov't Opp. at 20. He was one of three teenagers who planned

and carried out the attempted robbery.  Id.  He fired the shot that killed Mr. Kim.  Id.; PSR ¶ 12.
The other two people who participated in the offense were also under eighteen, and Mr. White
does not contend – nor does the record reflect – that any adult pressured or influenced him to
carry out the crime.  Gov't Opp. at 20; see PSR ¶¶ 4-6; Mot. at 32.  Mr. White's role as a lead
participant weighs against granting Mr. White's sentence reduction.

      10.  Diminished Culpability of Juveniles and Hallmark Features of Youth

      The IRAA's tenth factor draws on the Supreme Court's decision in Miller v.
Alabama – indeed, quoting the Court verbatim – by requiring courts to consider the "diminished
culpability of juveniles as compared to that of adults, and the hallmark features of youth,
including immaturity, impetuosity, and failure to appreciate risks and consequences, which
counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded
nature of any particular crime."  D.C. Code § 24-403.03(c)(10); see Miller v. Alabama, 567 U.S.
at 471.  The D.C. Council and the U.S. Supreme Court have both been clear:  when it comes to
sentencing, "children are different."  Miller v. Alabama, 567 U.S. at 481; 2016 Comm. Rep.
at 3-4.  This factor weighs in favor of a sentence reduction for a person like Mr. White, who was
seventeen at the time of his offense and whose actions reflect the "recklessness, impulsivity, and
heedless risk-taking" characteristic of juvenile offenders.  Miller v. Alabama, 567 U.S. at 471.

      The government has asserted that Mr. White's sentence does not "run afoul" of
cases like Miller, Graham, and Roper because he was not sentenced to a mandatory term of life
imprisonment without parole despite his participation in a serious crime.  Gov't Opp. at 21.  This
argument is neither persuasive nor responsive to the inquiry mandated by the IRAA.  The IRAA
requires courts to consider how the "hallmark features of youth" counsel against condemning
juveniles to spend most of their adult lives in prison, isolated from their families and

communities.  D.C. Code § 24-403.03(c)(10).  This factor specifically directs courts to consider

the developments in social, psychological, and neurological science that elucidate juvenile brain

development, rather than focusing on the brutal nature of a juvenile's offenses.  See id.; 2016

Comm. Rep. at 3-4.   Indeed, these considerations are the focal points of cases such as Miller,

Graham, and Roper, and accordingly, those cases inform the Court's analysis.

       The Supreme Court has outlined three general differences between juveniles and

adults that warrant treating juvenile offenders differently.  Roper v. Simmons, 543 U.S. at 569.

First, juveniles more often exhibit immaturity and an underdeveloped sense of responsibility,

resulting in reckless, impetuous behavior.  Id.; see Miller v. Alabama, 567 U.S. at 472

(explaining that psychological and neurological differences between children and adults help to

account for children's "transient rashness, proclivity for risk, and inability to assess

consequences"); see generally Shields Rep. at 17-30 (explaining that "modern study of the

adolescent brain" reveals that "adolescence is a period like 'driving a car without [brakes]'").

Second, juveniles are more "susceptible to negative influences and outside pressures" than

adults.  Roper v. Simmons, 543 U.S. at 569; see Shields Rep. at 21 (explaining that studies on

adolescent neurodevelopment indicate that adolescents have "exquisite external sensitivity to

proximal external or contextual influences . . . relative to adults").  Third, the "personality traits

of juveniles are more transitory, less fixed."  Roper v. Simmons, 543 U.S. at 570.  Because of

these differences, juveniles have a "diminished culpability" when compared to adults and "have

a greater claim than adults to be forgiven for failing to escape negative influences in their whole

environment."  Roper v. Simmons, 543 U.S. at 570-71; see Miller v. Alabama, 567 U.S. at 471.

       These "characteristics of youth" tend to "weaken rationales for punishment," even

when youth offenders commit heinous offenses.  Miller v. Alabama, 567 U.S. at 473.  Without

discounting the suffering brought about by Mr. White's actions and the devastating impact on

Mr. Kim's family, this Court must recognize that Mr. White was only seventeen at the time of

his offense.  Much of Mr. White's behavior in his youth was characterized by recklessness and a

failure to consider the consequences of his actions – skipping school, running away from home,

stealing cars, and using drugs at an early age are all consistent with the immaturity that sets

young adults apart from adults.  See Mot. at 12, 24-25.  Mr. White's more serious prior offenses

similarly demonstrate a substantial disregard for the safety of others and the inability to foresee

potentially severe consequences of his actions.  See PSR ¶¶ 17-20.  His childhood is replete with

examples of his vulnerability to peer pressure and exposure to violence.  He explains that he

stole, robbed, used drugs, and behaved aggressively because people around him modeled those

behaviors.  See Mot. at 12-20, 25-26, 32; Miller v. Alabama, 567 U.S. at 477 (accounting for a

juvenile offender's "family and home environment" and "the way familiar and peer pressures

may have affected him").

         The evidence Mr. White has presented about the man he is today is impressive

and provides a clear example of how juvenile offenders have substantial capacity for change.

See Roper v. Simmons, 543 U.S. at 570 ("[I]t would be misguided to equate the failings of a

minor with those of an adult, for a greater possibility exists that a minor's character deficiencies

will be reformed."); see also supra Subsection IV.B.5 (discussing Mr. White's demonstrated

maturity); Subsection IV.B.3.b (discussing Mr. White's participation in rehabilitative

programming).  Mr. White has reflected on his behavior and has demonstrated sincere remorse

for his actions that have caused others to suffer from profound and devastating loss.  See Hearing

Tr. at 38:6-40:11; Mot. at 22, 60-63; White Ex. 31 (2020 Personal Statement).  Despite the

brutality of Mr. White's crimes, this Court concludes that Mr. White's "diminished culpability"

at the time of his offense and his "heightened capacity for change" weigh strongly in favor of

release.  Miller v. Alabama, 567 U.S. at 479.

### 11.  Unenumerated Considerations

The final statutory factor functions as a catchall and empowers the Court to take

into consideration other relevant information not yet considered.  D.C. Code § 24-403.03(c)(11).

Mr. White has presented an extensive post-release plan, including housing, family support,

employment, counseling, and a plan to continue his education, all of which weigh in favor of a

sentence reduction.

Mr. White has been accepted into the Reentry Transitional Housing Program with

Jubilee Housing.  See White Ex. 69 (Jubilee Housing Acceptance).  Jubilee Housing "provides

supportive transitional housing and wraparound services for men and women who are looking to

rebuild their lives in a supportive, drug- and alcohol-free environment."  Jubilee Housing's

Reentry Housing Initiative Program, Jubilee Housing (last visited July 5, 2023)

https://jubileehousing.org/reentry/ <https://perma.cc/5B9H-3HC6>.  As a participant in this

program, Mr. White will reside in a Jubilee Housing facility for about one year while developing

the skills necessary for a safe and successful reentry into the larger community.  Id.; see White

Ex. 69 (Jubilee Housing Acceptance).  As the Probation Office stated at the August 3, 2023

resentencing hearing, Jubilee Housing has "amazing" wraparound services and programs.

Furthermore, the Probation Office explained that Mr. White may be eligible to extend his time

with Jubilee Housing if he stays on the right path and continues meeting their conditions for

residence.  Jubilee Housing has confirmed that a bed is available for Mr. White in Northwest

D.C. upon his release from custody.  See Response to Probation Memoranda and Court Order

[Dkt. No. 147-1].  The government, Probation Office, and Mr. White all agree that the Jubilee Housing facility is the best place for Mr. White to begin his reentry process.

   In addition to securing a stable residence with a reentry program, Mr. White will also be eligible to participate in a specialized program designed for IRAA recipients through the Mayor's Office of Returning Citizens ("MORCA").  See White Ex. 34 (MORCA Letter). Through that program, he will have access to case management resources, counseling services, and workforce development resources to ensure that he stays employed.  Id.  Mr. White will also have access to the services of Changing Perceptions, an organization dedicated to "ensur[ing] the smooth reintegration and success of returning citizens in the Washington metropolitan area through hands-on and authentic mentoring, guidance, training, networking, individualized support, and referrals to needed services."  See June 2023 Supp. at 2; White Ex. 71 (Changing Perceptions Letter); June 2023 Supp.  Changing Perceptions has helped hundreds of people who have been released from prison under the IRAA, and their IRAA clients currently have a zero percent recidivism rate.  See White Ex. 71 (Changing Perceptions Letter).  Mr. White is currently "an active participant receiving pre-release services" from Changing Perceptions; after his release, Changing Perceptions will provide Mr. White with financial support for transportation, professional clothing, groceries, and housing, as well as with additional financial literacy and professionalism resources.  See June 2023 Supp. at 2; White Ex. 71 (Changing Perceptions Letter).

   While he will be living in a Jubilee Housing facility, Mr. White will also be surrounded by his supportive network of family members upon his release.  His cousin, Alfreda Nelson, and his aunt, Delores Nelson, are very supportive of Mr. White's release and have explained how they have developed their relationships with Mr. White while he has been

incarcerated.  See White Ex. 28 (Alfreda Nelson Letter); White Ex. 29 (Delores Nelson Letter).

His cousin, Kevin White, also wrote a letter to the Court, in which he offered to

> connect [Mr. White] to family and friends as a support system.  I
> have kept on the straight and narrow because of my kids, my job and
> my determination to stay out of trouble and be a productive member
> of society.  I will pass this knowledge on to [Mr. White] to help him
> stay on the straight and narrow to become a productive member of
> society.

White Ex. 27 (Kevin White Letter).  Mr. White's family members have repeatedly expressed

their unwavering support for him, as demonstrated most recently by Kevin White and Alfreda

Nelson's attendance at the August 3, 2023 resentencing hearing.  See June 2023 Supp. at 2.

After completing the Jubilee Housing program, Mr. White hopes to live

independently in the District of Columbia, where he will be able to continue taking advantage of

the District's programs for returning citizens.  See, e.g., White Ex. 34 (MORCA Letter); White

Ex. 71 (Changing Perceptions Letter).  His family members, Kevin White and Alfreda Nelson,

would allow Mr. White to reside with them if he is not able to live independently immediately

after completing the Jubilee Housing Reentry Transitional Housing Program.  See White Ex. 27

(Kevin White Letter); White Ex. 28 (Alfreda Nelson Letter); White Ex. 47 (Alfreda Nelson

Decl.).  The Probation Office had previously raised concerns about Kevin White and Alfreda

Nelson's residences.  See Kevin White Probation Mem. (████████████████████

████████████); Alfreda Nelson Probation Mem. (████████████████████

████████████████████████████████████████

████████).  Because Mr. White has secured a place at a reentry housing facility, the Court

does not need to address the Probation Office's concerns at length in this opinion.  It is

noteworthy, however, that several circumstances about which the Probation Office expressed

concern have been ameliorated.  See White Ex. 47 (Kevin White Decl.) (████████████

███████████████████████████████████████); Shields Rep. at 40-41 (████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████); June 2023 Supp. at 3 (███████████████████████

█████████████████████); see also supra Subsection IV.B.7 (discussing Dr. Shields's expert

report at length).  Even while Mr. White resides at a Jubilee Housing facility, the Court is

confident that Kevin White and Alfreda Nelson will provide valuable support throughout Mr.

White's reentry process.

Kevin White, in fact, will serve as a particularly outstanding role model for Mr.

White.  According to Mr. White's submissions, Kevin White was released from prison in 2006,

and since then, he has stayed out of trouble, worked consistently, and "rehabilitated himself to a

remarkable degree."  Supplement Regarding Proposed Release Address [Dkt. No. 110] at 2; see

Mot. at 63.  A recent submission from the Probation Office has verified that Kevin White has no

recent criminal convictions, notes that Kevin White is "gainfully employed," and explains that

Kevin White is "supportive and realistic about having a safe plan in place that would allow

Antoyne White's transition back into the community."  Residence Probation Mem. at 1-2.

Similarly, the Probation Office explained at the resentencing hearing that Kevin White is an

"amazing" resource for and supporter of Mr. White.  The Court agrees that Kevin White will

"serve as a daily positive example to Mr. White of what he can achieve once released."

Supplement Regarding Proposed Release Address [Dkt. No. 110] at 2.

Those who know Mr. White say they are confident that he will be a productive,

supported member of the community when he is released – and Mr. White's efforts to ease his

reentry process make that clear, as well.  Mr. White plans to work toward his commercial

driver's license ("CDL"), having already completed a CDL course while incarcerated.  Mot.

at 63-64; Supplement [Dkt. No. 133] at 3.  He has plans to continue his college education.  <u>See</u>

Mot. at 64; White Ex. 31 (2020 Personal Statement); June 2023 Supp. at 2.  He has even been

offered a job with P.A.S. Electrical in Upper Marlboro, Maryland.  White Ex. 45 (Job Offer); <u>see</u>

June 2023 Supp. at 3 (confirming that Mr. White's job offer remains open).  Jubilee Housing will

provide Mr. White with the stability to support his immediate reintegration into the community.

<u>See</u> White Ex. 69 (Jubilee Housing Acceptance); Response to Probation Memoranda and Court

Order [Dkt. No. 147-1].  He has also sought out myriad resources to facilitate his adjustment to

life outside of prison.  <u>See</u> White Ex. 34 (MORCA Letter); White Ex. 36 (15-30-Life Brochure);

White Ex. 48 (Kelli Taylor Letter); White Ex. 49 (LEAD Up! Informational Guide); White Ex.

71 (Changing Perceptions Letter).  Finally, Mr. White appears committed to engaging in both

individual and group counseling to address the loss, trauma, ███████████ that he has both

experienced and caused.  Mot. at 64-66.  His commitment to self-improvement and self-

reflection is impressive given the hardships he has endured before and during his incarceration.

Mr. White's efforts to ensure his safe reentry and his existing network of family support weigh in

favor of a sentence reduction.

## V.  CONCLUSION

As the Supreme Court has established, "children who commit even heinous

crimes are capable of change."  <u>Montgomery v. Louisiana</u>, 577 U.S. at 212.  Mr. White has

served twenty-five years in prison for a devastating and regrettable offense when he was

seventeen years old, in which he was responsible for the death of Mun Hon Kim.  The effects of

his actions are felt to this day by Mr. Kim's family and members of the community, and this

Court's findings "do not in any way diminish the gravity of his offenses."  White Ex. 42, <u>United</u>

<u>States v. Plummer</u>, at 21.

By enacting the IRAA, however, the D.C. Council intended to pave the way for people like Mr. White – people who were exposed to violence and significant hardship as young adults; people who made grave, life-altering mistakes in their youth, but who have worked tirelessly throughout their incarceration to better themselves.  Mr. White would not be eligible for a resentencing without the IRAA.  Mr. White would also likely not be where he is today if not for his loving family, who have made clear that they will welcome him back into the community with compassion and support.  But most importantly, Mr. White himself is responsible for this opportunity and for this Court resentencing him to time served.  As a young man, he received a long, harsh sentence – he expected to spend decades, if not the rest of his life, in prison.  Nevertheless, he dedicated himself to his education and to becoming a better person. He has matured tremendously despite spending the majority of his life in prison.  The IRAA has afforded Mr. White a second chance, and the Court is confident that Mr. White will make the most of it.  Mr. White has demonstrated that he can and will become a productive member of society.

After careful consideration of the evidence presented and the eleven statutory factors, this Court concludes that Mr. White does not pose a danger to the safety of any person or to the community.  D.C. Code § 24-403.03(a)(2).  The Court further concludes that the interests of justice warrant a sentence modification in this case.  Id.  Mr. White has met his burden under the IRAA, and the Court will grant Mr. White's Motion for Reduction of Sentence Under the Incarceration Reduction Amendment Act of 2016.

An Order and Judgment consistent with this Opinion providing additional details regarding the terms of Mr. White's amended sentence and probation will issue within the next few days.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8|4|23